**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Raymond Cross,<br><br>    Plaintiff,<br><br>vs.<br><br>United States Department of the Interior,<br><br>    Defendant. | No. CIV 18-220-TUC-CKJ<br><br>**ORDER** |

Pending before the Court is the Motion to Dismiss ("MTD") (Doc. 10) filed by the United States Department of the Interior ("the government"). Plaintiff Raymond Cross ("Cross") has filed a response (Doc. 11) and the government has filed a reply (Doc. 12). Also pending before is the Request for Oral Argument (Doc. 13) filed by Cross. The government has filed a response (Doc. 14).

I. *Factual and Procedural Background*[1]

Cross is an enrolled member of the Three Affiliated Tribes ("TAT"). The TAT is a federally recognized Indian tribe and resides on the treaty-established Fort Berthold Reservation ("Reservation") in northwestern North Dakota. Cross is the spokesman for an *ad hoc* group of tribal members who have decided to request a Secretarial Election, via a

---

[1] Unless otherwise stated, the facts are taken from the Complaint (Doc. 1), as amended to include a certification of compliance with Fed.R.Civ.P. 11 (Doc. 6).

Secretarial Petition, that would be administered by the Secretary.[2] More specifically, this *ad hoc* group seeks to petition the Secretary of the Interior ("the Secretary") to call a Secretarial Election "for the purpose of repealing a 1986 constitutional amendment that had extinguished the pre-existing right of ALL (emphasis added) of the [Three Affiliated Tribes'] non-resident, but otherwise constitutionally qualified, tribal voters to vote by absentee ballot in all tribal elections." Complaint (Doc. 1, ¶ 15). The Complaint asserts many non-resident tribal voters have found returning to the Reservation to be economically or physically impracticable and unduly burdensome. The TAT Constitutional provision the *ad hoc* groups seeks to put up for referendum states:

> For the purpose of voting in Tribal Business Council Elections exclusively, any eligible voter of the Tree Affiliated Tribes, whose place of legal residence is located outside of the exterior boundaries of the Fort Berthold Reservation on the date of an election shall return to the Reservation in order to vote in the election and shall register to vote and case his ballot at the appropriate segment polling place on the date of the election.

TAT Const., Art. IV, sec. 2(b). Complaint, Ex. I (Doc. 1-9, p. 4).

The Complaint alleges the building of the world's largest earth-filled dam on the Reservation took over 156,035 of TAT's best and last remaining agricultural lands.[3] This resulted in the destruction of nine historic river bottom communities, geographically fragmented the Reservation, and caused the exodus from the Reservation of TAT's younger and productive members. Approximately 75%-80% of TAT's enrolled members live and work off the Reservation.

TAT's 1936 Constitution has not been comprehensively amended or revised to take into account the demographic and geographic changes. The Constitution continues to grant TAT's overall political authority to the "relatively small minority of tribal members who

---

[2]The Complaint alleges the *ad hoc* group of members is on the Fort Berthold Reservation. However, the Court notes the Complaint states Cross' address as in Tucson, Arizona.

[3]The Complaint alleges this was pursuant to the federal government's intentional breach of its 1886 Agreement with TAT due to the enactment of the Garrison Dam Taking Act of 1949.

- 2 -

reside within the Reservation's six (6) segments or electoral districts and who possess the exclusive constitutional authority to vote for representatives to [TAT's] governing body known as the Tribal Business Council [("TBC")]." Complaint (Doc. 1, ¶ 38).

In a letter sent on May 17, 2017, Cross requested the Local Fort Berthold Agency Official, Superintendent Kayla Danks ("Danks"), to inform Cross as to the minimum number of tribal signatures required to validate the Secretarial Petition. The MTD asserts that, on May 18, 2017, Danks sent a letter, via email, to the Chairman of TAT informing the Chairman of Cross' letter requesting the total number of tribal members age 18 or older, consistent with 25 C.F.R. § 81.57(a)(2)(I). The MTD asserts that TAT's Enrollment Officer informed Danks there were 10,340 living adult tribal members as of that date. By letter dated May 18, 2017, Danks informed Cross of the total number of living adult tribal members, and that consistent with Article X of TAT's Constitution, 3,447 signatures would be needed for a valid petition, "provided the other strict requirements under the Secretarial Election regulations for a valid petition are followed." Response, May 18, 2017 Danks letter, Ex. 1, Att. 4 (Doc. 10-1).

Danks provided a formal Decision to Cross which stated, *inter alia*:

> As stated in our May 18, 2017 letter, we received the enrollment information [that there were 10,340 living enrolled tribal members who were 18 years of age or older] from the Tribal Enrollment Office, which was then divided by one-third, which then equals 3,447 signatures of qualified voters. After conferring with higher management, we have concluded that since this information was relayed [to Danks] from the Tribe and pertains to Article X, of the Three Affiliated Tribes' Constitution, it does not present any information or decision that is appealable under 25 C.F.R. § 2.7(c).

Complaint, Ex. B, June 21, 2017 Decision of Danks (Doc. 1-2).

The Complaint alleges neither Danks nor the Great Plains Regional Director Timothy LaPointe ("Director") of the Bureau of Indian Affairs ("BIA") fulfilled Cross' request. The Complaint alleges Danks and the Director claim they were legally entitled to by-pass a requirement in the TAT Constitution, Art. X, that they determine the minimum number of constitutionally "qualified voters" who must sign a Secretarial Petition to render it valid.

- 3 -

Danks asserts the information provided to her by the Tribal Enrollment Officer entitled her to use that number in determining how many tribal members' signatures were required. The Director asserts Art. X's silence regarding the qualifications of the tribal members constitutionally required to sign the Secretarial Petition triggered a default federal regulation, 25 C.F.R. § 81.53, which authorized all adult tribal members of TAT to be used in determining qualified tribal voters.

On July 14, 2017, Cross provided a Notice of Appeal ("NOA") to Danks pursuant to 25 C.F.R. § 2.9. The NOA referenced both Danks' decision as to the number of signatures required and the conclusion that this decision was not appealable.

The Decision on appeal stated:

> . . . You concede in your appeal that the Superintendent properly calculated the number of signatures needed for a valid petition based on the tribally provided number of tribal members who were 18 years of age and older as of May 18, 2017. If the Superintendent's basic mathematical calculation is correct, as you concede, other than that unchallenged calculation, the Superintendent made no decision and merely acted as a pass-through for information provided by the Tribe as required by 25 C.F.R. § 81.57(a)(2)(i) and (ii).
>
> * * * * *
>
> Although Article X of the Constitution uses the term "qualified voters" in relation to determining the number of signatures needed for a valid petition, the section does not define "qualified voters." Where the tribal constitution is silent, it does not supplant federal regulations. Given that 25 C.F.R.. § 81.57(a)(2)(i) requires only a listing of tribal members "18 years of age or elder, to determine the number of tribal members who must sign a petition," it seems clear that to be qualified for purposes of signing a petition to request a Secretarial Election, one must merely be a tribal member eighteen (18) years of age or older.

Complaint, Ex. E, October 16, 2017 Decision of Director (Doc. 1-5, p. 4).

On November 15, 2017, Cross filed a NOA with the Interior Board of Indian Appeal ("IBIA"), requesting the IBIA to review the Director's Decision. The IBIA dismissed the appeal for lack of jurisdiction, stating:

> [The applicable regulation] does not envision BIA making a final decision on whether a petition is valid before a petition is submitted. [Cross] purports to be the spokesperson for a group that intends to submit a petition, and has not yet submitted a petition.
>
> Principles of standing and ripeness reinforce our conclusion that the Regional

> Director's decision does not constitute a "final administrative action or decision" within the meaning of the Board's appeal regulations. It appears doubtful that the Regional Director's interim action regarding the number of required signatures, in the absence of a petition submitted by [Cross] and a decision on the validity of such a petition, has resulted in an actual or imminent, concrete and particularized injury to [Cross], *cf. Northern Cheyenne Livestock Ass'n v. Acting Rocky Mountain Regional Director*, 48 IBIA 131, 136 (2008) (requirements for standing), or that [Cross'] argument could not be raised, in an appropriate forum, as part of a challenge to a decision on the validity of a petition.

*Cross v. Great Plains Regional Director, Bureau of Indian Affairs*, 65 IBIA 89, 92-93, 2018 WL 4078292 at * 3 (Jan. 11, 2018). The IBIA also denied Cross' request for reconsideration. *Cross v. Great Plains Regional Director, Bureau of Indian Affairs*, 65 IBIA 157, 2018 WL 4078312 (Feb. 28, 2018).

On April 25, 2018, Cross filed a Complaint for Declaratory Relief with this Court (Doc. 1). The Complaint alleges:

1. The IBIA erred in holding the Director's Decision to Supplant Art. X's signature collection standard with 25 C.F.R. § 81.53 (which purportedly authorized all 10,340 adult members of TAT to sign the Secretarial Petition) did not constitute final agency action as required by 43 C.F.R. § 4.331 and 25 C.F.R. § 2.7(c).

2. Danks' arbitrary and capricious action of delegating the responsibility for determining how many tribal members must sign the Secretarial Petition to the employee of a presumptively antagonistic and rival entity clearly violated the constitutional prohibition against a federal official delegating her entrusted regulatory authority to an inappropriate entity.

3. The Director's Decision to supplant Art. X's substantive standards with 25 C.F.R. § 81.52 (which purportedly authorized all 10,340 adult members of TAT to sign the Secretarial Petition) constitutes a clear abuse of discretion and a clear abridgement of Cross' right to petition the federal government for redress of his grievances pursuant to Art. X of TAT's Constitution and right of petition clause of the First Amendment of the U.S. Constitution.

4. The Director's failure to defer to Art. X of the TAT Constitution violated the

Director's duty to do so under 25 C.F.R. § 81.9 and demonstrated his intentional subversion of the government-to-government relationship between the federal government and Cross, as well as Cross' fellow tribe petitioners, to such a degree that the Secretarial Petitioning process is totally inoperable (in contravention of Art. X's provisions and fundamental Indian Law principles) on the Reservation.

5. The Director's interpretation of Art. X as silent regarding the definition and application of the constitutional phrase "qualified tribal voters" conflicts with established law as expressed in *Hudson v. Great Plains Regional Director*, 61 IBIA 253, 2015 WL 10939233 (September 15, 2015) and must, therefore, be set aside as required by the Administrative Procedure Act, 5 U.S.C. §706(2)(A).

Complaint (Doc. 1). Cross has filed an amendment to include a certification of compliance with Fed.R.Civ.P. 11 (Doc. 6).

On July 16, 2018, the government filed a Motion to Dismiss (Doc. 10). Cross has filed a response (Doc. 11) and the government has filed a reply (Doc. 12). On September 4, 2018, Cross filed a Request for Oral Argument (Doc. 13); the government has filed a response (Doc. 14).

II. *Request for Oral Argument* (Doc. 13)

Asserting this case raises potentially significant and novel questions in the areas of federal Indian and administrative law, Cross requests this matter be scheduled for oral argument. The government asserts Cross' request should have been included in his response to the MTD and is nothing more than an impermissible sur-reply.

Here, the parties have thoroughly presented the facts and briefed the legal issues. The Court finds it would not be assisted by oral argument and, therefore, declines to set this matter for oral argument. *See* LRCiv 7.2(f); 27A Fed.Proc., L. Ed. § 62:361 (March 2019) ("A district court generally is not required to hold a hearing or oral argument before ruling on a motion.").

III. *Subject Matter Jurisdiction*

The government asserts the Court lacks subject matter jurisdiction of this matter. As courts of limited jurisdiction, federal courts are presumptively without jurisdiction over civil actions. *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). The burden of establishing the contrary rests upon the party asserting jurisdiction. *Id*. The Ninth Circuit has stated:

> A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction. By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted). The moving party may "convert[ ] the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court . . . " *Savage v. Glendale Union High Sch.*, Dist. No. 205, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003). And, as a general matter, a district court deciding a factual attack on jurisdiction "need not presume the truthfulness of the plaintiffs' allegations" and may "look beyond the complaint . . . without having to convert the motion into one for summary judgment." *United States ex rel Meyer v. Horizon Health Corp.*, 565 F.3d 1195, 1200 n.2 (9th Cir. 2009) (citation omitted), overruled on other grounds by *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015).

*Wichansky v. Zoel Holding Co., Inc.*, 702 F. App'x 559, 560 (9th Cir. 2017). The party opposing a factual attack on jurisdiction has the burden of proving that subject matter jurisdiction does exist, and must present any necessary evidence to satisfy this burden. *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989). If a plaintiff's allegations of jurisdictional facts are challenged by the adversary in the appropriate manner, a plaintiff cannot rest on the mere assertion that factual issues may exist. *Trentacosta v. Frontier Pac. Aircraft Ind., Inc.*, 813 F.2d 1553, 1558 (9th Cir. 1987) (quoting *Exch. Nat'l Bank of Chi. v. Touche Ross & Co.*, 544 F.2d 1126, 1131 (2d Cir. 1976) ). If a nonmoving party fails to meet its burden and the court determines that it lacks subject matter jurisdiction, a court must dismiss the action. Fed.R.Civ.P. 12(h)(3).

A. *Sovereign Immunity*

The Complaint asserts federal question jurisdiction under 28 U.S.C. § 1331 as the

primary basis for subject matter jurisdiction. However, the United States has not waived its sovereign immunity by the enactment of 28 U.S.C. §§ 1331 and 1343.[4] *Cuevas v. Department of Homeland Security*, 233 F. App'x 642, 643 (9th Cir. 2007) (citing *N. Side Lumber Co. v. Block*, 753 F.3d 1482, 1484 (9th Cir. 1985)); 14 Fed. Prac. & Proc. Juris. § 3655 (4th ed. Nov. 2018). Similarly, the Declaratory Judgment Act does not provide a basis for subject matter jurisdiction. *Skelly Oil Co. v. Phillips Petr. Co.*, 399 U.S. 667, 671 (1950); *Countrywide Home Loans, Inc. v. Mortgage Guar. Ins. Corp.*, 642 F.3d 849, 852 (9th Cir. 2011); 14 Fed. Prac. & Proc. Juris. § 3655 (4th ed. Nov. 2018).

The Complaint also refers to the Administrative Procedure Act ("APA"). The APA "contains a specific waiver of the United States' sovereign immunity." *Matsuo v. United States*, 416 F.Supp.2d 982, 988 (D. Haw. 2006) (citing *Bowen v. Massachusetts*, 487 U.S. 879, 891–92 (1988)); *see also Navajo Nation v. Dep't of the Interior*, 876 F.3d 1144, 1168 (9th Cir. 2017). The APA "waives sovereign immunity broadly for all causes of action that meet its terms" irrespective of whether the claims satisfy the APA's requirements for judicial review of an agency action. *Navajo Nation*, 876 F.3d at 1172; *see also The Presbyterian Church (U.S.A.) v. United States*, 870 F.2d 518, 525 (9th Cir. 1989) (Section 702 is "an unqualified waiver of sovereign immunity in actions seeking nonmonetary relief"). Thus, a plaintiff need only seek nonmonetary relief against the government in order to avail himself of the APA's waiver of sovereign immunity. In this case, Cross seeks non-monetary relief against the government, based on claims regarding the purported actions and failures to act of federal officials. Cross' claims for relief fall squarely within the broad waiver of sovereign immunity reflected in section 702 of the APA.

---

[4]The Court does not disagree with Cross that 28 U.S.C. § 1331 may provide jurisdiction over federal questions. However, that does not address whether sovereign immunity may bar a suit.

B. *Administrative Procedures Act*

While the APA waives the government's sovereign immunity, the APA also includes requirements for judicial review. As a general matter, the APA permits suits against the United States by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of relevant statute[.]" 5 U.S.C. § 702. This portion of the statute constitutes the APA's judicial review provision. *See e.g. Navajo Nation*, 876 F.3d at 1168. Claims asserted pursuant to the APA must satisfy section 702's "agency action" requirement and the further requirement under section 704 of the APA that a plaintiff must identify a "final agency action" to obtain judicial review. 5 U.S.C. § 704. The APA does not permit review where "statutes preclude judicial review" and "where the agency action is committed to agency discretion by law." 5 U.S.C. § 701(a).

The finality requirement is considered a necessary element of any APA claim. *Dalton v. Specter*, 511 U.S. 462, 469 (1994); *Wild Fish Conservancy v. Jewell*, 730 F.3d 791, 800 (9th Cir. 2013) ("To maintain a cause of action under the APA, a plaintiff must challenge "agency action" that is "final."). A plaintiff has the burden of identifying specific federal conduct and explaining how it is "final agency action," *Lujan v. National Wildlife Federation*, 497 U.S. 871, 882 (1990), and identifying a discrete agency action that the federal agency was legally required to take but failed to do so, *Norton v. Southern Utah Wilderness Alliance (SUWA)*, 542 U.S. 55, 64 (2004).

The Ninth Circuit has stated:

> For agency action to be final, it must "mark the consummation of the agency's decisionmaking process" and "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (internal quotation marks omitted). "We focus on the practical and legal effects of the agency action" and interpret finality in a "pragmatic and flexible manner." *Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006); *see also Indus. Customers of NW. Utils. v. Bonneville Power Admin.*, 408 F.3d 638, 646 (9th Cir. 2005) (considering any "direct and immediate effect on the day-to-day operations of the party seeking review," and if "immediate compliance with the [action's] terms is expected"). Regardless of an agency's characterization, we consider the actual effects of the action to determine whether it is final. *Columbia Riverkeeper v. U.S. Coast Guard*, 761 F.3d 1084, 1094–95 (9th Cir. 2014).

*Gill v. United States Dep't of Justice*, 913 F.3d 1179, 1184 (9th Cir. 2019).

"The imposition of an obligation or the fixing of a legal relationship is the indicium of finality in the administrative process." *Cabaccang v. U.S. Citizenship & Immigration Servs.*, 627 F.3d 1313, 1316 (9th Cir. 2010). "Indicia of finality include: the administrative action challenged should be a definitive statement of an agency's position; the action should have a direct and immediate effect on the day-to-day business of the complaining parties; the action should have the status of law; immediate compliance with the terms should be expected; and the question should be a legal one." *Mount Adams Veneer Co. v. United States*, 896 F.2d 339, 343 (9th Cir.1990) (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 239–40 (1980)). "The core question is whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 465 F.3d 977, 982 (9th Cir.2006).

1. *Agency Action as Related to Cross' Request*

The government argues that Cross "was made aware by BIA that the information provided by the FBA Superintendent was not a final agency action, but rather an interim process by which the BIA conveyed information requested by [Cross]." Motion (Doc. 10, pp. 9-10). Further, the government asserts it requested Cross to submit his petition for review and comment, which Cross failed to do. "Because the BIA did not (and could not) make a final decision on the validity of the petition before it was submitted, there was no final agency action and this Court lacks subject matter jurisdiction." *Id*. at 10.

Cross asserts, however, that the decisions of Danks and the Director represented the final determination of the number of tribal member signatures needed to validate a petition. Further, he asserts the action created rights and obligations from which legal consequences flow – specifically, that "an administratively legal binding standard for evaluating the validity of Plaintiff Cross' Secretarial Petition" has been created. Response (Doc. 11, p. 15).

In considering the indicia of finality, the Court finds the administrative action

challenged is not a definitive statement of an agency's position. Rather, there is no indication that, if Cross would submit a Secretarial Petition, and TAT's Enrollment Officer submitted a number of qualified voters determined by the same method, the government would rely on the information. More significantly, there is no allegation that, if Cross would submit a Secretarial Petition, and TAT's Enrollment Officer submitted a number of qualified voters determined by a *different* method, the government would rely on the information that had been previously provided to Cross in response to his request (i.e., information based on the original method).[5] In other words, the information provided by the government to Cross does not have the status of law and serves "more like a tentative recommendation than a final and binding determination." *Bennett*, 520 U.S. at 178 (citation omitted). The Court also considers that the information provided to Cross had an effect on Cross. However, this does not appear to affect the day-to-day business of Cross, but the unusual business of possibly preparing and submitting a Secretarial Petition. Further, the effect was indirect in that it affected Cross' decisions on how to proceed, but it did not *require* any action or lack of action.[6] Similarly, immediate compliance was not expected. For example, Cross could have

---

[5]For example, Cross refers to the 2013 Secretarial Election which appears to have utilized a different method in determining qualified tribal voters. There is no basis to conclude the TAT Enrollment Officer and/or the government would necessarily decline to consider the use of the 2013 method in determining qualified tribal voters once a Secretarial Petition is actually filed. "So long as [Cross] retains the opportunity to convince the agency [or the TAT Enrollment Officer] that [a different method for determining qualified tribal voters is appropriate to use], it makes no sense for a court to intervene. It conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 733 (D.C. Cir. 2003)

[6]Cross asserts he is mystified by the IBIA's statement that no actual or imminent, concrete and particularized injury to Cross has occurred. However, the government's actions did not "impose an obligation, deny a right, or fix some legal relationship as a consummation of the administrative process." *Ukiah Valley Med. Ctr. v. F.T.C.*, 911 F.2d 261, 264 (9th Cir. 1990). Until the government actually accepts or rejects a potential Secretarial Petition, it cannot be said an obligation has been imposed, a right has been denied, or a legal relationship has been established.

chosen to proceed with a Secretarial Petition with a lesser number of signatures to see what the ultimate actions/decisions of both the TAT Enrollment Officer and the government were as to the validity of the Secretarial Petition. Rather, "[n]o legal consequences flow from the agency's conduct to date, for there has been no order compelling [Cross] to do anything." *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324 F.3d 726, 732 (D.C. Cir. 2003). Although Cross argues that the government's decision was substantive, binding and final, there is no basis to conclude the government has established an "interim procedure;" rather, until the government has an opportunity to review and either accept or reject a Secretarial Petition, there is no decision that requires compliance. Additionally, although Cross argues factual issues are presented in this case, it does not appear any material facts are in dispute. Indeed, the parties agree the TAT Enrollment Officer provided a number and Danks calculated the number of required signatures from that number. It is only the legal question of whether the government should have relied upon the number provided by the TAT Enrollment Officer that is at issue.

In considering these factors, the Court finds no final agency action occurred in this matter. Rather, the government provided information to Cross, but did not take any action that represents the consummation of an agency's decisionmaking process. As the government has not yet reviewed any Secretarial Petition submitted by Cross, no rights or obligations have been determined. *Bennett*, 520 U.S. at 177–78. As Cross is not challenging a final agency action, his cause of action cannot proceed under the APA. *Jewell*, 730 F.3d at 800. The Court finds it does not have subject matter jurisdiction of this matter and dismissal is appropriate.

V. *Alleged Actions in Excess of Statutory Jurisdiction or Authority*

To the extent Cross argues the government acted in excess or its statutory jurisdiction or authority, the Court declines to address these arguments as it has not been established this Court has subject matter jurisdiction over this matter.

Accordingly, IT IS ORDERED:

1. The Request for Oral Argument (Doc. 13) is DENIED.

2. The Motion to Dismiss (Doc. 10) is GRANTED.

3. This matter is dismissed for lack of subject matter jurisdiction. The Clerk of Court shall enter judgment and shall then close its file in this matter.

DATED this 27th day of March, 2019.

_____
Cindy K. Jorgenson
United States District Judge